## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| Jane Does 1, and 2[1] by and through their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe[2], <br><br> Plaintiff, <br> v. <br><br> Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, Inc., U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation, USA Federation for Sport Cheering d/b/a USA Cheer, Charlesbank Capital Partners, LP, Bain Capital, LP, Jeff Webb, individually, Champion Elite Legacy Ashley Hughes, and Erick Kristianson, <br><br> Defendants. | COMPLAINT <br> (DEMAND FOR A JURY TRIAL) |

## STATEMENT OF THE CASE

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiff in this matter will be identified only as Jane Doe in conjunction with the factual underpinnings on this complaint.

[2] These cases were previously filed as separate matters under Civil Action Numbers: 6:22-cv-02146; 6:22-cv-02147, and 6:22-cv-02149 and consolidated thereafter for all purposes.

Plaintiffs file this complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (3) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (4) constituting violations of contractual and/or equitable responsibilities owed to Plaintiffs.  As a direct and proximate result of Defendants' collective and individual conduct, Plaintiffs sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof, they allege facts as follows at all times relevant to this Complaint:

## <u>INTRODUCTION</u>

1.     Champion Elite Legacy ("Defendant Champion Elite") was a private All-star cheer and tumbling business in South Daytona, Florida, offering coaching and training services for athletes of all ages, including the three Plaintiffs.

2.     Defendant Champion Elite, by and through its owner, Defendant Ashley Hughes, employed and empowered an All-star coach, Erick Kristianson

("Defendant Kristianson"), to train young athletes, providing him with access to these same athletes, and opportunities to create relationships and connections with these athletes.

3. Defendant Champion Elite was considered a certified member club working in a consortium with the other Defendants, including – Jeff Webb, Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer"), Defendant Bain Capital, and Defendant Charlesbank (collectively "the PE Defendants"), which sole specific promises of a safe sport to expand the Varsity Defendants' network of minor athletes and prop up the Varsity Defendants' billion-dollar business.

4. Similarly, Defendant Kristianson was considered a certified coach by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants, a classification that essentially identified Kristianson as a duly vetted and safe coach for working with minor children, such as Plaintiffs.

5.     Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson were part of a network of gyms, owners, coaches and vendors empowered and placed in positions of trust and authority by Defendant Webb and the other Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants.

6.     At the same time, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Charlesbank and Defendant Bain Capital knew or had the opportunity to know that Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson were either engaged in significant misconduct with or abuse of minor athletes or were allowing pervasive abuse and misconduct against minor athletes.

7.     The scheme to anoint specific gyms and coaches at the expense of safety best practices occurred as the Varsity Defendants were creating and expanding a business model reliant upon a pipeline of young athletes, each of whom was a participant of a member gym, such as Defendant Champion Elite, and each of whom represented a significant financial contribution to the Varsity Defendants' and PE Defendants' business worth billions of dollars.

8.     The Defendants, together and individually have knowingly, or with a reckless disregard, created, organized, and propagated a system of young athlete abuse against innocent victims including Plaintiff Jane Doe 1, Plaintiff Jane Doe 2, and Plaintiff Jane Doe 3.

9.     This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

10.     This action arises pursuant to, and involves questions requiring the interpretation of the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.     Plaintiff Jane Doe 1 is a citizen residing in Volusia County, Florida.

13.     Plaintiff Jane Doe 2 is a citizen residing in Volusia County, Florida.

14.     Plaintiff Jane Doe 3 is a citizen residing Volusia County, Florida.

15.     Defendant Champion Elite Legacy, LLC ("Defendant Champion Elite") was a for-profit Limited Liability Company organized and existing pursuant to Florida law, with a principal place of business at 2330 S Nova Road

#15, South Daytona, Florida 32119. Defendant Champion Elite was a premier All-star cheer program, a USASF member club, and, by and through its employees, owners, agents, and authorized representatives, all within the course and scope of their responsibilities, did interact on a daily basis with minor children, both upon its premises, as well as at various camps, clinics, and competitions throughout the country.

16.     Defendant Ashley Hughes ("Defendant Hughes") owned and operated Defendant Champion Elite, and was a citizen and resident of Volusia County, Florida. As the owner and operator of a business providing All-star training and competition services to minor athletes, which necessarily included the transport of these minor athletes across state lines, Defendant Hughes had a responsibility to provide safe premises, personnel, and modes of training to minor athletes, including, without limitation the three Jane Doe Plaintiffs.

17.     Defendant Erick Kristianson was a citizen and resident of South Daytona, Florida and was employed by Defendant Champion Elite. During the timeframe of this complaint, Defendant Kristianson was a credentialed member of USASF and USA Cheer, and, as such, he was expressly permitted to interact with minor children.

18.     Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and/or controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States, to include substantial business in Florida.

19.     Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation). At all times relevant to this complaint, Defendant Varsity Brands retained significant control over the decision making, daily operations, and was the public face of Varsity Spirit, LLC, and "Varsity All-star."

20.     Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee. Throughout the relevant timeframe of this Complaint, Defendant Varsity Spirit, LLC has organized, participated in, promoted, and fostered Varsity Brand's private All-star cheer business, including by facilitating camps, competitions, and

clinics, and coordinating contracts with member gyms and coaches designed to exclusively funnel the athletes in these gyms to the Varsity network.

21.    Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") is a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas. At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. has been the parent company of Varsity Brands, Inc., and has retained significant control over the decision making, hiring, firing, training, and supervision of Defendants Varsity Brands and Varsity Spirit.

22.    Throughout this complaint, Defendants Jeff Webb, Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the "Varsity Defendants". At all times relevant to this Complaint, either directly or through affiliates, including those wholly owned and/or controlled, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, social media campaigns, acquisitions, cheer camps, gyms and competitions throughout the United States including Florida.

23.    Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its

principal place of business in Memphis, Tennessee, and was created and funded by Defendant Webb and the other Varsity Defendants as the self-proclaimed governing and regulatory body promulgating and enforcing rules for all of private All-star cheer. As set forth more fully in this complaint, Defendant USASF "certifies" coaches and gyms and promotes athlete participation in "sanctioned" events, which are almost entirely hosted by the Varsity Defendants and/or their subsidiaries. Defendant USASF has been controlled by the Varsity Defendants and does business throughout the United States, including Florida. (See attached as Exhibit 1, the USASF Code of Conduct).

24.     Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") is a non-profit entity also created and funded by Defendant Jeff Webb, is organized and existing in the state of Texas, and is the governing body for sport cheering throughout the United States. Defendant USA Cheer has been likewise controlled by the Varsity Defendants as described further herein. (See attached as Exhibit 2, the USA Cheer Bylaws).

25.     The Varsity Defendants and Defendants USASF and USA Cheer either directly and/or through the Varsity Defendants and their affiliates, which they control, have been charged with the duty and authority to: (a) promulgate

and/or enforce rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; (b) organize, promote, produce, and/or manage cheer camps, clinics, and competitions throughout the United States in furtherance of the goals and purposes of the conspiracy and conduct set forth herein; (c) establish guidelines and assess whether to certify gyms, coaches, and vendors, including without limitation those named herein, as members of USASF and/or USA Cheer, qualify to work with children and to otherwise provide "credentials" for these member gyms and affiliates; and (d) require that athletes, coaches, and clubs purchase annual memberships in order to participate in the Varsity Defendants' sanctioned events.

26.     Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. As set forth herein, and during the relevant timeframe, Defendant Charlesbank has been a minority and/or majority owner of the Varsity Defendants. During the relevant time period, Defendant Charlesbank has done significant business in Florida.[3]

---

[3] For instance, the Florida State Board of Administration invested hundreds of millions of dollars on behalf of the state's public pension fund in Charlesbank Funds VII, VIII, and IX. https://flauditor.gov/pages/pdf_files/2020-089.pdf; https://employer.frs.fl.gov/forms/2019-20_CAFR.pdf. And in November of 2021, Charlesbank acquired Empire Today, a portfolio company of H.I.G. Capital

27.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") has been a for-profit entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts. Since 2018, Defendant Bain Capital has been the majority owner of the Varsity Defendants. During the relevant time period, Defendant Bain Capital has done significant business in Florida.[4]

28.     This complaint involves abuse perpetrated upon minor athletes in and around Daytona, Florida, across state lines, and via electronic communications, and was perpetrated because of Defendant Kristianson's access to the minor Jane Doe Plaintiffs, which was enabled by, precipitated upon, and intrinsically linked to the network of cheering gyms, camps and competitions created by Defendant Jeff Webb, marketed by the Varsity Defendants and

---

based in Miami. https://www.williamblair.com/News/Empire-Today-and-Charlesbank-Capital-Partners-Transaction

[4] For instance, in November of 2021, Bain acquired a majority share in InnovaCare Health, based in Orlando, for an undisclosed amount (https://www.baincapital.com/news/innovacare-health-value-based-healthcare-leader-announces-majority-investment-bain-capital), and also launched Enhance Health LLC, headquartered in Fort Lauderdale, with a $150M capital investment led by Bain. (https://www.baincapital.com/news/enhance-health-new-digital-health-insurance-distribution-and-care-navigation-platform-launches). Furthermore, Defendant Bain Capital's Private Credit products are available in Florida. https://baincapitalprivatecredit.com/investor-resources/investor-documents

Defendants Bain and Charlesbank, and nominally regulated by Defendants USASF and USA Cheer.

29.     As set forth herein, all Defendants together created a nationwide and interconnected network. Even as set forth in internal guidance, policies, and procedures, the jurisdiction of the Varsity network extended over all members, including Defendants Hughes and Kristianson, as well as the gyms clinics, camps, and competitions where they coached, and those places where it was foreseeable that these Defendants would interact with minor athletes.

30.     Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. §1391 because: at least one of the Defendants is a resident of Volusia County, Florida, or is a corporation organized and existing, and with a principal place of business in South Daytona, Florida; each of the Defendants, by and through their role in the Enterprise, as described herein, had significant and pervasive contacts with Florida and this district, including through the flow of funds in interstate commerce, as well as the daily management, operation, control, training, and supervision of employees, and agents within the enterprise, and minor athletes who Defendants were

obligated to protect; and a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

31.    Private All-star cheer is a competitive and dynamic sport where athletes compete in a team setting mixing a variety of disciplines including cheer, dance, and tumble.

32.    In contrast to traditional sideline cheer, where athletes are generally a complement to another sport, such as football or basketball, All-star competitive cheer is a focus unto itself.

33.    Because of its unregulated nature, All-star cheer is not subject to traditional seasonal limitations, or other restrictions against year-round performance and training.

34.    As such, All-star cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

35.    This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or

more for transportation, lodging, membership dues and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

36.     While other private companies exist in All-star cheer, over the past two decades the Varsity Defendants have emerged as the pre-eminent business as the result of a focused initiative by Defendant Webb to monopolize all aspects of the industry to advance its market dominance.

37.     In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

38.     During his work with Herkimer, Defendant Webb familiarized himself with the business and began forming his own plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

39.     In 1974, Defendant Webb left Herkimer and formed his own company, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his

footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

40.     During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

41.     As with Herkimer's association, Varsity Spirit began as a provider of cheer camps.

42.     Defendant Varsity Spirit, LLC, thereafter expanded into competitions, merchandising, branding, social media, and even gym ownership and management.

43.     By the early 2000's, Varsity Brands, Inc. publicly represented itself as:

 a.  The largest designer, marketer, and supplier of cheerleader dance team uniforms and accessories;

 b.  The biggest operator of cheerleading and dance team training camps and clinics;

 c.  A leading organizer of special events for extracurricular activities;

 d.  A major provider of studio dance conventions and competitions; and

 e.  A producer of studio dance apparent for studio dance competitions.[5]

---

[5] *See* Varsity Brands, Inc., Form 10-K, (Apr. 1, 2002), available at: https://www.sec.gov/Archives/edgar/data/874786/000093041302001124/c23854_10k.txt

44.     As early as 2002, the largest source of revenue for Varsity Brands, Inc. came from its connection with All-star cheer.

45.     To encourage and increase revenue, the Varsity Defendants created "Varsity University," an "enterprise powered by Varsity Brands, [and which] offers comprehensive educational programming to schools and athletic programs."[6]

46.     The nine-course Varsity University Program encompasses three specific areas: Life Skills, Social Media, and Leadership. By and through Varsity University, organized by Varsity Brands, the Varsity Defendants annually bring together gym owners, coaches, and other certified and green-lit professionals, during which these adults, who pay into the Varsity network, become indoctrinated into the culture.

47.     Through their various dealings in the cheer industry, at all times relevant to this complaint, the Varsity Defendants have controlled an estimated 80-90% of the market.

48.     As the Varsity Defendants' footprint in the All-star cheer world expanded, so too, did its ability to obtain revenue from its affiliate gyms.

_____

[6] *See* Varsity University Online Education Programs Athletic Programs & Schools.

16

49.     As of today, and as set forth more fully herein, a substantial portion of the revenue from each individual athlete who cheers for a Varsity affiliate goes directly to the Varsity Defendants.

50.     The total competitive cheer industry is estimated to include as many as four million athletes throughout the United States, and is further estimated to generate billions of dollars of revenue annually.

51.     Defendant Champion Elite was a Varsity affiliated gym and represented a substantial financial contributor to the Varsity Defendants by training minor athletes and taking them to compete in Varsity events both within and outside of Florida.

52.     In or around 2021, Defendant Bain Capital reported that Defendant Varsity Spirit's annual earnings exceeded $1.3 billion.

53.     A huge source of revenue in the All-star world are the cheer camps, clinics, and competitions held locally, regionally, nationally, and even worldwide. These events frequently require athletes to travel across state lines.  These camps, clinics, and competitions provide significant revenue for the Defendants, either directly, or indirectly through increased exposure bringing in new crops of athletes.

54.     Today, these events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

55.     In 2003, a group of All-star cheerleading coaches formed an independent 501©(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for all-star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal all-star cheerleading rules.

56.     Within a week, Defendant Jeff Webb founded Defendant USASF in response, a move he intentionally calculated to absorb and eliminate this competitor group in order to retain complete control of the All-star cheer world.

57.     From inception, Defendant USASF was touted as the equivalent of a National Governing Body whose purpose was to oversee and provide specific safety mechanisms for member athletes.

58.     After forming Defendant USASF, Defendant Webb mandated that All-star athletes cheering on behalf of Varsity-affiliated gyms must purchase a USASF membership as a requirement to compete at Varsity-sponsored events.

Moreover, gyms and coaches who wished to compete at and attend Varsity-sponsored events were also required to become members of USASF.

59.     Within just a few years after the merger, USASF became the exclusive body providing regulatory oversight and enforcement for All-star cheer.

60.     At the same time, in or around 2006, the Varsity Defendants created the "USASF Certified" seal, a brand that the Varsity Defendants represented was synonymous with a warranty that the gym, the coach, the choreographer, and any other adult certified by USASF was held to the highest standards, followed best practices, including to prevent athlete abuse, and had been vetted as safe for working with children.

61.     The Varsity Defendants and Defendant USASF also mandated that any certified gym or member annually renew their certification. By so doing, Defendant USASF and the Varsity Defendants correspondingly vouched for these certified entities on an annual basis.

62.     Credentialing served as a signal to parents and athletes that USASF would continually monitor and ensure compliance by its member gyms, coaches, and affiliates.

63.     Meanwhile, the Varsity Defendants also required child athletes

cheering at USASF member gyms to pay for USASF membership, to buy their uniforms, accessories, and other apparel from the Varsity Defendants through their member gym, and to compete in a minimum number of Varsity All-star events each year.

64. The Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC both for buying Varsity merchandise and for sending their athletes to Varsity events.

65. The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own several gyms and cheer programs, many of which were failing or mismanaged before Varsity's takeover.

66. All-star athletes competing on behalf of Varsity-member gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

67. To encourage the purchase of Varsity apparel, Defendant Jeff Webb has publicly stated that teams performing at Varsity competitions who wore a full Varsity uniform and accessories received higher scores.

68. Gyms and coaches likewise pay monthly or annual fees to USASF,

USA Cheer and the Varsity Defendants.

69.     The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

70.     Athletes who compete on behalf of a Varsity-affiliated gym are precluded from transferring from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

71.     To this day, Defendant Webb remains intimately involved and interested in the competitive cheer world.

72.     In 2019, Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb, who was then chairman of the board at Varsity, "Jeff is still teaching and leading camps alongside our summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

73.     When Defendant Webb left Varsity in December of 2020, he told the media he would still be acting in a consulting role for the company.

74.     Defendant Webb also created and currently still controls the International Cheer Union, which is actively ushering competitive cheer into Olympic competition worldwide.

75.     The Varsity Defendants and their co-conspirators used private All-star cheer gyms like Defendant Champion Elite to gain access to paying athletes and their families, marketing to them that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport under strict safety standards.[7]

76.     Membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual Varsity events.

77.     The Varsity Defendants financially incentivize gyms to attend as many of their events as possible each year in the form of cash rebates and other enticements.

78.     When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at reportedly inflated prices. Varsity dubs this the "stay-to-play" system.

---

[7] *See* "Sanctioned Competitions," USASF available at: <u>Sanctioned Competitions - Cheer & Dance | USASF</u> ("When All Star clubs attend USASF Sanctioned Competitions, they can be assured their athletes, coaches, and parents are attending events that comply with the sport's best safety practices")

79.     Failure by an athlete to stay at the Varsity designated hotel could subject the entire team to disqualification.

80.     Alcohol is either made available or sold at many of Varsity's All-star events.

81.     At each of the events, the Varsity Defendants are aware that minor athletes are staying in the same hotels, and sometimes the same rooms, as USASF certified adult coaches, choreographers, and vendors.

82.     Moreover, at most of these events, the Varsity Defendants know or have reason to know that minor athletes are being exposed to drugs and alcohol.

83.     In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-affiliated, USASF All-Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.

84.     This intensive personal training is represented as necessary for an athlete to rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day.

85.     This system of promoting intensive one-on-one time with the athletes

gives coaches and staff increased access to young and impressionable athletes and corresponds to increased funding for the Varsity Defendants' system of camps and competitions, and which creates future generations of Varsity coaches and Varsity-backed gyms.

86.    To inspire greater and more dedicated athlete participation, the Varsity Defendants, in conjunction with their member gyms, coaches, and vendors, in 2011 created "Cheerlebrity," whereby the Varsity Defendants used their online, social media, and significant industry influence to promote certain gyms, coaches, and athletes as celebrity role models.

87.    "Cheerlebrity" became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

88.    "Cheerlebrity" was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote Varsity All-star gyms and cheerleaders through social media presence.

89.    "Cheerlebrity" is one example of marketing and branding that catered specifically to young athletes and was intended to increase young athlete participation and desire to participate in the industry.

90.    Moreover, the popularity of "Cheerlebrity," began a concerted

campaign by the Varsity Defendants and Defendant USASF to reach droves of young potential athletes online, and these Defendants encouraged their member athletes, coaches and gyms to similarly utilize social media, and online branding and content to increase athlete participation.

91.     Defendants Champion Elite and Hughes were well-known in the Varsity Spirit, LLC community, enjoying status and promotion on the Varsity Defendants' marketing platforms and branding content, including social media materials. As such, the Varsity Defendants boosted the reputations of Defendants Champion Elite, Hughes, and Kristianson in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost Defendant Champion Elite and Defendants Hughes' reputations and footprints in the Varsity world.

92.     To further perpetuate this connection between Varsity-backed athletes and coaches, parents were encouraged to allow their children to travel to gyms, camps and competitions, and to stay with host-families, choreographers, and gym owners, and the children were encouraged to look up to these leaders in their sport.

93.     As a critical part of their scheme, Defendants, including the Varsity

Defendants, Defendant USA Cheer and Defendant USASF, tout the safety and security of their affiliate-gyms and coaches through the sale and marketing of their "certified" status to lull parents into comfort whereby they have no fear for the safety of their children to train and compete with them.

94.     Through this certification, or credentialing Defendant USASF, by way of authority conferred by the Varsity Defendants, "credentials coaches, certifies legality officials, sanctions events and maintains and adjusts (as needed) safety guidelines, all with the goal of providing the safest possible environment for cheer and dance athletes to train and compete."

95.     This message from Defendant USASF's website was the impetus behind Plaintiffs' participation and annual membership renewals. Plaintiffs relied upon messages such as this from Defendants about the safety of the Varsity network over other cheer networks.

96.     The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity-sponsored gyms.

97.     This feature of the system serves to disassociate the athletes from their families, and foster a familial closeness with the Varsity-sponsored gyms, coaches,

and gym owners.

98.     Tho perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon constant representations that the network of gyms and coaches, such as Defendants Champion Elite, Hughes, and Kristianson, are safe for interacting with children.

99.     At the Varsity University conferences, while learning about the Varsity network and how to expand its influence to more children and their families, coaches, gym owners, and vendors experience a party atmosphere which encourages alcohol consumption and reports of resulting debaucheries are widespread.

100.   The coaches and gym owners are also inundated with promises of gifts and financial gain if they continue to produce young member-athletes and continue promoting the Varsity brand.

101.   The Varsity Defendants have perpetuated a party atmosphere at their member gyms, as well as in camps and competitions, where minor athletes are knowingly exposed to alcohol and drug use, and which does not adequately

promote athlete safety including from emotional or physical harm and abuse.

102.   By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the Enterprise for years whereby these athletes spend tens of thousands of dollars apiece for their membership, coaching, uniforms, camps, training, competition fees, travel fees, and other merchandise, until the athletes "come of age" and become coaches and gym owners themselves, perpetuating the abuse cycle.

## The Varsity Defendants' Control Over the Gym Environment

103.   Under the direction and control and/or supervision of Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank, to perpetuate the business of the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, Defendants have relied upon access to child athletes who will pay regular dues and fees to compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

104.   To gain advantage over other private All-star cheer event companies and brands, the Varsity Defendants specifically promised that their network of coaches, gyms, trainers, choreographers and videographers provided superior

safety and was, "the gold standard" for athlete safety, encouraging athletes and their families to trust in the network.

105.    For example, on the Varsity website, which is applicable to Defendants Varsity Spirit, Varsity Brands, LLC, and Varsity Brands Holding Company, the Varsity Defendants make numerous representations about the importance of participant safety, including safety from abuse and misconduct.

106.    Varsity has also posted: "At Varsity Spirit and Varsity All-star, the health and safety of athletes is top priority. Varsity Spirit is committed to creating a safe and positive environment for its participants' physical, emotional, and social development and promoting an environment free from abuse and misconduct."

107.    Varsity also made specific representations about how it would implement this promise to patrol the sport, stating: "Varsity Brands, Varsity Spirit's parent company, has formed a Safety Council to include outside, independent experts who will help to closely examine and evolve current athlete safety guidance – including with respect to detecting and preventing sexual misconduct against minors – while incorporating best safety practices. Please direct all questions and concerns regarding safety to safety@varsity.com."

108.   The Varsity Defendants have also represented: "Varsity Spirit provides training to Varsity Spirit Instructors and Staff regarding abuse and reporting. Varsity Spirit enforces its own policies that prohibit abuse and misconduct and are designed to reduce, monitor and govern the areas where potential abuse and misconduct might occur, in addition to the policies implemented by USA Cheer and USASF addressing certain types of abuse and misconduct. The following types of misconduct are specifically prohibited in these policies: (i) Sexual Abuse and Misconduct; (ii) Physical Abuse and Misconduct; (iii) Emotional Abuse and Misconduct; (iv) Bullying, Threats, and Harassment; (v) Hazing."

109.   The Varsity Defendants concluded, "these policies contain proactive measures such as restrictions on one-on-one interactions with minor athletes, travel policies, and communication policies." [8]

110.   On September 20, 2022, Varsity Spirit president Bill Seely sent a message to gym owners and coaches "reaffirming Varsity All-star's long-standing commitment to athlete safety," and touting Varsity Brands and Varsity Spirit as the "gold standard" for cheer and dance.

---

[8] Information available at: <u>Varsity Spirit - Safety</u>

111.    The Varsity Defendants intended for parents and athletes to rely on these specific promises when deciding whether to participate in the Varsity All-Star network over other private All-star networks, and used the power of this messaging, as well as enforcement bodies USASF and USA Cheer to completely overwhelm the industry, and each of the Jane Doe Plaintiffs and their families did rely on these specific promises about safety when choosing to participate with Varsity network gym Champion Elite, and Varsity members, Defendants Hughes and Kristianson.

112.    The Defendants also intended for the athletes and their parents to rely on these specific assurances of safety in order to continue collecting membership dues and fees from athletes in exchange for protection through Defendants USASF and USA Cheer band the Varsity Defendants.

113.    The Varsity Defendants, specifically through personal actions by Defendant Webb, created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

114.    At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate all-star cheer by setting guidelines,

31

policies, procedures, and processes to ensure an environment that was safe for young athletes in the All-star cheer arena.

115.   In 2006, Defendant USASF began "certifying" All-star cheer gyms with a special seal of approval, a credential that warranted the gym and its coaching staff could be trusted for cheerleader safety.

116.   Defendant USASF also credentialed coaches of certified gyms, requiring that these coaches register with USASF, and, by and through the USASF seal, certifying that the coaches were safe and green-lighting the coaches as participants in USASF-sanctioned events, camps, clinics, and competitions.

117.   As a further demonstration of its authority, in 2009, Defendant USASF created the "Professional Responsibility Code," which purportedly applied to all members and established guidelines to "maximize not only the integrity and legitimacy of the all-star industry, *but to safeguard the athletes who participate*." (Emphasis added).

118.   Yet, according to its parameters, the ethics that the USASF community strive to achieve are geared more toward discouraging members from internal poaching or solicitation than respecting the bodily integrity of young athletes. For

instance, the ethical standards outlined in the Professional Responsibility Code include the following:

    i.  I pledge, as a member of the USASF, I will not initiate contact with another program's athletes and families in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical;

    ii.  I pledge, as a member of the USASF, I will not encourage any of my athletes or family members to contact another program's athletes and families during the competitive season in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical.

    iii.  I pledge, as a member of the USASF, I will honor and encourage everyone to respect all mutual agreements and/or contracts made between parties, whether formal or informal, by programs, coaches and athletes….

*See* USASF Professional Responsibility Code, Version 11.0, Process.

119. By creating a Professional Responsibility Code requiring members to pledge against internal competition, USASF essentially guaranteed that gyms would enjoy uninfringed access to and control over athletes and their families.

120. Defendant USASF also took over the reporting and investigation into allegations of misconduct at member gyms, and by individual members, creating a central reporting mechanism. As such, if an athlete or their family member

wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

121.   In 2007, Defendant Webb personally, and on behalf of the other Varsity Defendants, also formed USA Cheer, which was established to provide guidelines, policies, procedures, and processes to ensure a safe environment for young athletes in competitive cheer, including All-star.

122.   Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

123.   Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

124.   However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants.

125.   The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

126.   For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

127.   Defendant Varsity Spirit, LLC was listed for a time as the owner of Defendant USASF.

128.   During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF, which sets policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of USASF.

129.   As Varsity has acquired more and more of the previously independent event producers who made up a portion of Defendant USASF's board, it has expanded its influence over the USASF Board, with as much as 75%

of the seats on the Board of Directors being attributable to Varsity and its numerous entities. The seats that Varsity does not control do not have voting rights.

130.    Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

131.    Upon information and belief, the Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

132.    As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

133.    Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

134.    Each of the seven aforementioned entities is owned by the Varsity Defendants and the PE Defendants.

135.    John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity and these non-profit governing bodies. He said Varsity's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

136.    This structure meant that the Varsity Defendants were entirely self-regulated and were not accountable to any independent entity.

137.    In the 2010s, and amidst reports of sexual abuse against young athletes competing in a variety of sports, Congress authorized the creation of the U.S. Center for SafeSport, whose goal is to end sexual, emotional, and physical abuse on behalf of athletes.

138.    Around the same time, in 2010, in Cheer Coach & Advisor Magazine[9], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of all-star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the

---

[9] At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

baseline of education for each individual coach and also expect these standards to be met."

139.    Since its founding, USASF has supported the SafeSport mission, and has recognized the importance of protecting athletes from sexual, physical, and emotional abuse within the sport.

140.    Despite insinuating to members that Defendant USASF participated in SafeSport, Defendant USASF has never provided any compliance reporting regarding All-star to the U.S. Center for SafeSport. Instead, Defendant USASF operates its own version of SafeSport, Safe@Allstar, purposefully misleading families into thinking that this internal reference to SafeSport is the same thing.

141.    Athletes and their families, including Jane Does 1, 2, and 3, , understood the Varsity Defendants, and Defendants USASF and USA Cheer were responsible for protecting athletes from harm and paid these entities in part for this service. Instead, these entities failed to actively protect these athletes, and appropriately investigate reports of misconduct, to communicate internally and with law enforcement about misconduct, and has further failed to operate as intended.

142.    The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches, choreographers, and music producers who are known or suspected to have committed child sexual abuse.

143.    Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which in addition to discouraging competition among members, specifically acknowledges the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

144.    According to its own literature, the Professional Responsibility Code is applicable to "all members," referring to Varsity-affiliated gyms.

145.  In addition, according to Defendant USA Cheer's bylaws, a primary purpose of Defendant USA Cheer was to "[e]ncourage and support safety in Cheer, including (i) providing and coordinating technical information on physical training, equipment design, coaching, and performance analysis in Cheer…". (USA Cheer Bylaws as p. 6).

146.  At the same time that Defendant USASF and Defendant USA Cheer, and even the Varsity Defendants, publicly supported the mission of SafeSport, the Varsity Defendants were simultaneously lobbying against the inclusion of cheer as a sport.

147.  The Varsity Defendants' effort to preclude cheer from being considered a sport is directly in line with Defendant Varsity Spirit's business model. If cheer were considered a sport, it would necessarily increase athlete oversight and regulation, and would diminish the times, methods, and places that the athletes would be allowed to compete.

148.  From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the

purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

149.    During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

150.    In fact, Defendant Charlesbank initially purchase the Varsity Defendants for about $1.2 billion, but nearly doubled this value when it sold the majority of the company to Defendant Bain Capital less than four years later.

151.    In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.8 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

152.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's

extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[10]

153. In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[11]

154. Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was

---

[10] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.
[11] *Id.*

mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

155.    According to publicly available information, Defendant Bain's strategy was to leverage the Varsity Defendants' monopoly over services in the All-star industry (i.e. the gyms, camps, clinics, and member services) to support product sales.[12]

156.    This was not the first acquisition by Defendant Bain of a company purporting to offer camps and other services to youth. In 2006, Defendant Bain purchased CRC, a company providing therapy services to troubled youth in Utah and California.

157.    Following the Bain acquisition, and application of its accelerated growth model, CRC experienced a drastic increase in reports of abuse, including six wrongful death lawsuits related to children in its care.[13]

158.    Notably, Defendant Bain was not a mere investor in CRC. Rather, members of CRC actually sat on Defendant Bain's board.

---

[12] *See* "Bain to Acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion," Lauren Hirsch (Jun. 19, 2018), available at Bain in a reported $2.5B deal for school spirit company Varsity Brands (cnbc.com). As set forth in the article, "[t]he bet is [Varsity's] service-focused business [i.e. camps, competitions, and clinics] will help support product sales and fend off online competitors."
[13] *See* Dark side of a Bain success | Salon.com.

159.    Defendant Bain enjoyed a similar relationship with Defendant Varsity Brands after the 2018 acquisition, taking seats on Defendant Varsity's Board, and ingraining itself into the decision-making of the company, including its decisions surrounding athlete safety.

160.    Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising out of the Varsity Defendants' alleged anti-competitive tactics in acquiring gyms and curbing other event-companies.

161.    In 2020, former Varsity-member coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season. Harris plead guilty in February, 2022, and was sentenced in July, 2022 on two counts, one of which included traveling across state lines with the intent of soliciting sex from a minor. This travel occurred in conjunction with a cheer competition.

162.    After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated that these measures "will provide a

robust athlete safety infrastructure readily available across the entire cheer community."

163.    This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

164.    According to a December 7, 2020 press release issued by Defendants USASF and USA Cheer related to the Unified Ineligibility List: "We took these latest steps to ensure that our processes for reporting abuse are clear and consistent throughout the cheer community, and to facilitate the identification of individuals deemed a threat to participants."

165.    As of the date of filing of Plaintiffs' initial complaints, this list included roughly 230 names and entities, including Defendant Erick Kristianson. The vast majority of the suspensions, both temporary and permanent, are related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

166.    Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

167.   In addition, the list does not provide the status of the investigation, and is not updated on a regular basis.

168.   For instance, as it relates to Defendant Kristianson, and despite public reporting and news articles related to the allegations of sexual misconduct against him, Defendant USASF's website lists him only as temporarily suspended, and provides that this suspension is based on "[m]ember policy violation related to athlete protection."

169.   Any USASF member who is suspended has the right to appeal the decision. Yet, the affected athletes never receive notice that the suspended coach has invoked their appellate rights, nor are the athletes otherwise involved in this appellate process or decision.

170.   Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF, the Varsity Defendants and the PE Defendants.

171.   The majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This repeated misconduct gave notice to

all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

172.   Yet, other than the list, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

173.   During the interim of the allegations set forth above, the Varsity Defendants, under the ownership and control of Defendant Bain and Defendant Charlesbank, and in conjunction with Defendant USASF and Defendant USA Cheer, have hosted multiple competitive events throughout the United States including the annual Worlds' competition in Orlando, Florida, during which time affiliated teams from across the country converge at a pre-selected location using hotels, premises, and businesses hand-selected by the Varsity Defendants.

174.   During these events, underage student athletes comingle with other teams, coaches, choreographers, and authorized Varsity vendors either without chaperones or minimally chaperoned, and are exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct and innuendoes, including by coaches such as Jerry Harris and Scott Foster.

175. At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

176. Moreover, the individual gyms serve as platforms selling additional Varsity branded merchandise, such as sweatshirts, tops, hats, and jewelry.

177. To perpetuate the popularity of certain gyms and coaches, the Varsity Defendants utilized social media, often liking posts and messages by specific athletes and coaches, such as Defendant Champion Elite, and Defendant Kristianson, and providing these same athletes and coaches with promotional codes to pass on to minor athletes to sell the Varsity Defendants' goods and services.

178. In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age

athletes, and the coaches and gyms used the Varsity Defendants' reputation to bolster their own reputation with minor athletes.

179.    The Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

180.    As such, it was contrary to the Varsity Defendants' business model for Defendants USASF and USA Cheer to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue for the Varsity Defendants.

181.    Rather, when allegations about a specific coach or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct.

182.    The PE Defendants knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately

enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for, and in contravention to the safety of child athletes.

183.   Moreover, to incentivize coaches and gyms, the PE Defendants continued to authorize the Varsity Defendants offering significant monetary benefits to increase sales of Varsity goods, and participation in Varsity events, including by providing cash rebates and promotional codes, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers.

184.   In these environments, it was reasonably foreseeable that the athletes would be minimally supervised, and that the athletes would be exposed to drugs and alcohol. his environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes.

185.   This competition and gym network  was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

186.   Plaintiffs are informed and believe that certain employees of the Varsity Defendants resigned their positions because of the abuse and systemic

failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, alcohol and drug use by coaches and athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

187.   Defendant Webb was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

188.   During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against coaches, choreographers, videographers, and music directors. The general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

189.   A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified gyms and preferred vendor lists.[14] Some of the cases of

---

[14]   https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had or should have had knowledge include:

    a.  A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continued to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

    b.  A Charlotte, North Carolina coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons, and attended a Varsity event in Florida

_____

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c.   A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d.   A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

190.   Moreover, Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct to law enforcement – contravening its representation that USASF and its members are mandatory reporters. (*see* USASF Terms and Conditions of Coach Membership);

191.    Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

192.     Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

193.    Ginger Wilczak, the part-time contract employee USASF eventually hired to field reports of misconduct, stated that she worked 10 hours per week at most.[15] In an interview with Mary Carillo in an HBO Real Sports investigative segment, she reported that she had been actively prevented from taking the necessary actions to perform the job function for which she was purportedly hired.

194.    Former Varsity executive Marlene Cota has also publicly stated her impression that Defendant Varsity placed its brand over the safety of its athletes.[16]

195.    Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry which was known to them to be rife with it.

---

[15] . https://usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

[16] *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) available at: http://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119.

196.    Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of all-star cheerleading and dance across the country. ***It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care***. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

197.    In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

198.    In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

199.    In 2012, Defendant USASF reiterated its "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused

on how our sport is presenting its athletes, particularly those in the younger age groups."

200.   At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

201.   It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

202.   In 2018, the SafeSport Act was ratified as an amendment to the Child Abuse Victim's Right Act, creating a private right of action for minor athletes who had been abused and creating the U.S. Center for SafeSport, a central regulatory body and clearinghouse for investigation of reports of sexual abuse of minors through their sports.

203.   Defendant USASF, while knowingly failing to perform their own self-regulating functions, which Plaintiffs funded, began fraudulently misrepresenting that Defendant Webb's All-star cheer industry had submitted to the jurisdiction of the U.S. SafeSport Center.

204.    Defendant USASF took multiple affirmative steps to misrepresent that it was affiliated with the U.S. Center for SafeSport on its website, which this Complaint alleges was owned and maintained, at least for a time, by Varsity.

205.    In December of 2019, almost a year after the SafeSport Act became law, the Defendants, rather than submitting cheerleading to the authority of SafeSport's oversight and reporting requirements, continued to oversee themselves.[17]

206.    However, in January of 2019, Defendant USASF began linking to the U.S. Center for SafeSport on its website, going so far as to use the Safesport logo.[18]

207.    By May 31, 2019, Defendant USASF had added a "SafeSport" tab to its website, but the information under it was still only USASF's former internal athlete protection resource.[19]

208.    As of November 20, 2020, Defendant USASF was still including a "SafeSport" tab on its website, but suddenly stopped linking to the U.S. Center for SafeSport.[20]

---

[17] https://web.archive.org/web/20181202034012/http://usasf.net/home/
[18] https://web.archive.org/web/20190120173539/http://www.usasf.net/programs/resources/athleteprotection/
[19] https://web.archive.org/web/20190531215354/http://www.usasf.net/safesport/about/
[20] https://web.archive.org/web/20201130044317/https://www.usasf.net/

209.    Then, in early December of 2020, around the time Defendant Webb left Varsity, Defendant USASF changed the tab to "Safe Sport" (with a space) on its site.[21]

210.    To this day, neither Defendant USASF nor the Varsity Defendants has ever actually participated with the U.S. Center for SafeSport program.

211.    Around this same time, Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act, but in so doing, effectively shifted responsibility for reporting abuse and exploitation from the corporate entities empowered to oversee the sport onto minors and their families telling athletes they should consider their appearance and how they present themselves, and when posting photos to social media, they should first ask themselves: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" The Varsity Defendants asked for "thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

212.    Meanwhile, Defendant USASF continued to fail to follow its own procedures with respect to rampant reports of child sexual abuse, allowing

---

[21] https://web.archive.org/web/20201228081625/https://www.usasf.net/

complaints to stall or delaying action when their policies clearly call for an adult member to be suspended or banned.

213.   Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse", and "sexual assault" to find people to ban[22]. Between June and September that year, Lord had identified five (5) names.

214.   Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

215.   Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG, criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to

---

[22] It is telling of the problem that Lord used words related to sexual abuse when looking for coaches, gym owners, and affiliates who violated USASF policy. This very specific search criteria demonstrates that USASF understood the risks of harm inherent to the sport.

wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

216.    Well after the very public arrest of Jerry Harris, Defendants USASF and USA Cheer finally began offering risk and safety training to member gyms and personnel.

217.    However, instead of mandating this risk and safety training for all members, and providing training free of charge, the Varsity Defendants require members to pay an additional fee to access Defendant USASF and Defendant USA Cheer's safety training.

218.    Defendant USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

219.    Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying gyms had, in fact, enacted guidelines.

220.    Defendant USASF has previously stated that it does not have the ability to enforce its own policies and procedures, referring to these as "recommendations" rather than requirements.[23]

221.    Eventually, Defendant USASF created an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

222.    Moreover, the victim must cite to the alleged rule or regulation their attacker violated, requiring them to study codes in various places on the website from a slew of different sources in order to make a valid report.  By so doing, Defendant USASF shifted its mandatory duties to investigate and report child abuse to the victim and their family, and adding an unnecessary layer of complexity in the process of reporting a predator.

---

[23] *See* "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Leif Regstad, Houston Press (Jul. 21, 2015) available at: https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

223.   The cumbersome nature of the reporting process, coupled with the fear many kids feel in coming forward against coaches and gym owners who would not immediately be ousted, as Defendant Kristianson bragged to one of his victims in this case, effectively chilled reporting.

224.   Kelli Hughes, the director of the Center for Child Policy, asserted she found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

225.   For the 2021 Worlds at Disney World in Florida held in May of 2021, Defendant USASF sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated a ratio of one (1) adult chaperone, defined as anyone 21 years of age or older, for every nine (9) child athletes.

226.   In an October 2021 hearing before the Federal Trade Commission, David Owens, the director of events for Open Championship Series, another private All-star company, told regulators that the power the Varsity Defendants

hold over USASF and USA Cheer presented an "immediate threat to the health, well-being, and safety of the children and the sport."[24]

227.   Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

228.   Defendant USASF has repeatedly disseminated public messages about its role in ensuring athlete safety and protection, for instance:

    A.   On August 23, 2022, USASF posted: "From requiring background screenings for adults in All-star to creating and enforcing safety standards at all USASF Sanctioned competitions and developing tools for clubs to train young athletes, the highest priority for the USASF is the safety and protection of athletes in All Star."

---

[24] *See* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (October 13, 2021), available at: http://sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

B.  On August 13, 2022, USASF posted: "Our athletes deserve our best and everything the USASF does is to help them succeed. Setting the highest standards for coaches and helping them stay at the top of our sport is crucial for that success. That's why more than 7,000 coaches are credentialed each year to demonstrate their abilities to coach All Star. Additionally, the USASF coaches must complete background checks and athlete protection training as basic membership requirements."

229.   These repeated and continuous messages about athlete protection from Defendant USASF, at a time when Defendant USASF knew or should have known it was offering no such protective measures, created a heightened risk because abusers like Defendant Kristianson became emboldened to continue sexual conduct with minors confident in the knowledge that Defendants USASF and USA Cheer took no action against them even in the face of reports of abuse.

230.   Moreover, the "USASF sanctioned events" referred to throughout these near-daily messages were all events created by the Varsity Defendants, and the gyms and coaches Defendant USASF promoted as safe were all affiliated with and in direct relationships with the Varsity Defendants.

231.    The messages and representations about how athlete safety and protection were paramount to the Varsity network experience were created and promulgated under the guidance and instruction of Defendants Bain Capital and Charlesbank, both of whom expanded the Varsity network's reach by billions of dollars.

232.    In short, the PE Defendants, the Varsity Defendants, and Defendants USASF and USA Cheer have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

## The Champion Elite Legacy Gym

233.    Defendant Champion Elite was a private cheer, dance, and tumbling gym offering its services to children as well as adults in Florida.

234.    Defendant Champion Elite was owned by and operated by Defendant Ashley Hughes.

235.    Defendant Champion Elite was a highly awarded and profitable program within the Varsity Defendants' community.

236.    Defendant Champion Elite was certified by Defendant USASF as meeting All-star standards with respect to coach credentials, program quality, and athlete safety.

237.    As such, the Varsity Defendants warranted to athletes and families that Defendant Champion Elite and its owners and coaches, employees, and adult athletes, including Defendant Kristianson, could be trusted with minor children while training for and attending Varsity events.

238.    Defendant Kristianson was an employee of Defendant Champion Elite, working on behalf of Defendant Champion Elite and in the course and scope of his employment.

239.    As a condition of employing Defendant Kristianson, Defendant Champion Elite required Defendant Kristianson to become a coaching member of Defendant USASF.

240.    Moreover, Defendant Champion Elite represented that Defendant Kristianson was a credentialed member of USASF, adhering to Defendant USASF's policies and procedures protecting minors, including Jane Does 1, 2, and 3, from physical, sexual, and mental abuse.

241.   Defendant Champion Elite authorized, allowed, and represented that Defendant Kristianson was qualified to serve as a coach and mentor for minor athletes, including Plaintiffs, and thus provided Defendant Kristianson wide access to said minor.

242.   Defendant Champion Elite represented that Defendant Kristianson was credentialed and therefore a member of Defendant USASF's and the Varsity Defendants' authorized All-star community.

243.   Defendant USASF and the Varsity Defendants knew, or had reason to know, that Defendant Kristianson was in contact with minor athletes, including Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, and expressly and repeatedly authorized this contact.

244.   In fact, because Plaintiffs were members of Defendant USASF and were participants in and consumers of the Varsity network, Defendants not only knew of Plaintiffs' memberships, but also had the ability to know the approximate revenue each of them represented to the network.

245.   Defendants Hughes and Kristianson were also members of Defendant USA Cheer.

246.   Defendant Kristianson was a coach, mentor, and authorized representative of Defendants Champion Elite, USASF, and the Varsity Defendants, responsible for training and interacting with minor children, including Plaintiffs.

247.   Defendants Champion Elite, USASF, and the Varsity Defendants put Defendant Kristianson in a position of particular trust, and represented to the cheer community, including Plaintiffs, that he was safe to provide coaching services to minor athletes.

248.   However, Defendant Kristianson posed a known danger to minor athletes including Plaintiffs including risks of sexual harassment, exploitation, and abuse. Moreover, other members of Defendant Champion Elite's organization knew or had reason to know of the abuse perpetrated upon Plaintiffs by Defendant Kristianson and did nothing.

249.   Defendant Champion Elite remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and mandating that Defendant Champion Elite's athletes become members of Defendant USASF, including paying USASF annual dues.

250. All the while, Defendant Champion Elite was receiving financial incentives from the Varsity Defendants and PE Defendants for doing so.

251. Even today, Defendant USASF has only temporarily suspended Defendant Kristianson, and no action seems to have been taken against Defendant Champion Elite or Defendant Hughes.

252. Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, the PE Defendants, knew or should have known of the abuse being perpetrated by their credentialed coaches such as Defendant Kristianson.

## The Enterprise

253. Plaintiffs reallege the factual recitations from the preceding paragraphs as though repeated verbatim herein.

254. The unlawful acts alleged against Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson, who coached, choreographed, and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

255.   The alleged unlawful acts likewise performed and facilitated by, or aided and abetted by, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, and the PE Defendants, were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

256.   Plaintiffs allege Defendant Jeff Webb had a very personal role in decision-making and directing of the affairs of the entire Varsity network, including its rulemaking bodies.

257.   Defendants' officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

258.   Each Defendant, and any respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking billions of dollars from minor athletes by selling a specific promise of a safe competitive private cheer world, overseen and administered by Defendants,. At all times relevant to this Complaint, these Defendants, and each of them, knew this promise of a uniquely safe sport was false and that Plaintiffs were in fact in jeopardy of

being sexually and physically harassed and abused. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

259. Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise either on an ad hoc or formal basis.

260. Each Defendant participated in the operation and management of the Enterprise by, among other actions, promoting the Varsity network as uniquely safe for minor athletes, empowering governing bodies, inundating athletes with messages about safety, misleading athletes about the connection between the Varsity network, and the U.S. Center for Safe Sport, promoting the use of credentialing, certification, and the Unified Ineligibility List, restricting athlete movement, and requiring athletes to travel in pre-determined manners selected by the Varsity and PE Defendants, among other particulars.

261. The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

262. Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each

of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

263.   Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the Enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, the PE Defendants, Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson.

264.   The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All-star family, rather than separate parents and subsidiaries.

265.   Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the organizing, promoting, and managing of gyms, certifications, and cheer

competitions throughout the United States, and the sale of memberships that guaranteed the safety of children.

266. During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity network with the promise of a safe and superior coaching experience by joining a certified gym.

267. Defendant Charlesbank provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so.

268. When Defendant Charlesbank sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants to continue reaping the financial benefits of Varsity's business with Defendants Champion Elite, Hughes, and Kristianson.

269. Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and

superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

270.   Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheer's business Enterprise with Defendant Champion Elite and continues to do so as set forth herein.

271.   All Enterprise Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches in order to generate massive revenue from these athletes, all while these Defendants were collectively:

(a) Fraudulently misrepresenting that the Varsity network was the "gold standard" in athlete safety;

(b) failing to properly vet the coaches through adequate background checks;

(c) failing to provide sufficient oversight and monitoring of the member gyms;

(b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors;

(c) failing to report complaints of inappropriate and criminal sexual conduct against minors;[25]

(d) failing to enforce rules and regulations for chaperoning and supervision of minors;[26]

(e) failing to enforce ineligibility due to complaints regarding athlete safety;[27]

(f) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse;[28]

(g) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the minors would be served drugs and alcohol by other affiliated adults;

---

[25] (*see* USASF Terms and Conditions of Coach Membership);

[26] *See* "Sex Offender allegedly skirted ban to continue coaching cheerleaders," Jesse O'Neil, January 11, 2021, NYPost, available at: https://nypost.com/2021/01/11/sex-offender-allegedly-skirted-ban-to-continue-coaching-cheerleaders/; *see also* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (Oct. 13, 2021) (Commenting before the Federal Trade Commission during an open meeting, David Owens, available at: https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

[27] *See* "Cheerleading's Ban List Skips 74 Sex Offenders," Marisa Kwiatkowski & Tricia L. Nadolny, Sep. 22, 2020 USAToday.

[28] *See United States v. Jeremiah Harris*, C/A No. 20-CR-637, Plea Agreement available at: https://www.justice.gov/d9/press-releases/attachments/2022/02/10/harris_plea_agreement_0.pdf

(h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits;

(i) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants;

(j) using Defendant Champion Elite's platform to obtain access to significant financial resources of Plaintiff and other member-athletes, both for annual invoices and fees, as well as for merchandise, both mandatory and otherwise;

(k) disseminating fraudulent misrepresentations through mail and wire as to the safety Defendants guaranteed through a sham certification process;

(l) collecting money from minor athletes related to the above referenced scheme;

(m) requiring memberships of all minor athletes competing on behalf of member gyms, which, in part, allowed Defendants to track and monitor the number of minor athletes under their care;

(n) creating the "stay-to-play" system whereby Defendants mandated member gyms bring their minor athletes across state lines to competitions

and stay only at pre-selected hotels registered through them to allow Defendants to track these athletes and exercise control over their physical locations;

(o) disseminating fraudulent misrepresentations about Defendants' gym and coach certification process through the mails and wires so as to perpetuate the image of a safe environment for minor athletes;

(p) promoting certain coaches and athletes on social media who Defendants knew or should have known had engaged in illicit, predatory behavior and sexual misconduct with minors, all while authorizing these same individuals to sell goods for Defendants on Defendants' platforms, or with Defendants' endorsements;

(q) mandating annual membership in Defendant USASF by athletes, member coaches, and clubs creating a conflict wherein the USASF received monetary benefits from certified coaches who USASF was also obligated to investigate for misconduct;

(r) prohibiting athletes from transferring out of certain gyms so as to chill reporting and control competition;

(s) chilling athletes from coming forward with allegations by promising that

athletes who stayed in the system might achieve additional goals including collegiate opportunities;

(t) creating marketing materials and personas specifically intended to target and attract young children to the sport, including by using certain color schemes, wording, and imagery (*e.g.* Varsity All-star Instagram page, Varsity Spirit Instagram Page);

(u) failing to employ reasonable policies, procedures, guidelines and safeguards consistent with the purported "standard of care" Defendants have represented in their materials;[29]

(v) failing to properly staff, fund, resource, train, and otherwise enable the implementation of the instruments by which Defendants promised to police and govern the sport;[30] and

(w) interfering by the Varsity Defendants with the safety and regulatory

---

[29] *See* September 18, 2020 article in the USA Today, and commenting on the arrangement between Defendants USASF and Varsity Spirit. In the article, former Risk Management Center staffer John Patterson says that "Whatever Varsity wants, Varsity gets [from USASF]."

[30] *See* Commentary from Ginger Wilczak, former USASF Safesport Manager and part-time contract employee on the perpetual understaffing and lack of resources in USASF's office tasked with investigating reports of misconduct, "A huge slap in the face': Frustrations Grow Over Cheerleading's mishandled sexual misconduct cases," Tricia L. Nadolny, Marisa Kwiatkowski, USA Today (Dec. 23, 2020), available at: https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

operations of Defendants USA Cheer and USASF;[31]

**The Abuse**

**_Jane Doe 1_**

272.   Plaintiff Jane Doe 1 began cheering when she was around 11 years old.

273.   At the time she began her cheer career, Plaintiff Jane Doe 1 cheered at Defendant Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

274.   At all times relevant to this complaint, Plaintiff Jane Doe 1 was a member of USASF and paid her dues annually.

275.   At all times relevant to this complaint, Defendant Champion Elite was owned by Defendant Dr. Ashley Hughes, a chiropractor, and managed by Defendant Erick Kristianson, a 43-year-old man who also coached at the gym.

276.   Plaintiff Mary Doe and Plaintiff Jane Doe 1 met Defendant Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

---

[31] *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) (available at: https://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119/). In the article, ex-Varsity executive Marlene Cota bluntly states her impression that Varsity placed its brand over the safety of athletes. Cota was also featured in an episode of HBO's Real Sports.

277.    Over the next several months, Defendant Kristianson introduced his mother to Plaintiff Mary Doe, Plaintiff Jane Doe 1, and their family and shared details about his religious upbringing.

278.    Knowing that Plaintiff Mary Doe, her husband and children described themselves as a faith-based family, Defendant Kristianson took great care to emphasize his lifelong connections to religious organizations and his religious upbringing. This commonality helped Defendant Kristianson form a swift and meaningful bond with Plaintiff Mary Doe, Plaintiff Jane Doe 1, and their family.

279.    Beginning in or around 2020, Plaintiff Mary Doe and her family began to see Defendant Kristianson in social settings outside of the gym. Over time, Plaintiff Mary Doe and her family, including her minor daughter, Plaintiff Jane Doe 1, grew to love and trust Defendant Kristianson, welcoming him as part of their family.

280.    Plaintiff Mary Doe noticed that other parents at the gym similarly trusted and cared for Defendant Kristianson. Several families relied on Defendant Kristianson to transport their children to and from cheer, and some families even included him in their social gatherings and events.

281. Defendant Kristianson would often transport Plaintiff Jane Doe 1 and her sister to and from cheer practices and other cheer competition events.

282. Defendant Kristianson accompanied Plaintiff Mary Doe, her husband, and children (including Plaintiff Jane Doe 1) on several weekend trips, including trips to Tampa, Universal Studios, and Busch Gardens. By all accounts, Defendant Kristianson became like family to Plaintiff Mary Doe, her husband and children.

283. In or around 2022, Defendant Kristianson notified Plaintiff Mary Doe that he needed a place to stay. Plaintiff Mary Doe offered for Defendant Kristianson to temporarily move into a detached apartment on her property.

284. During this time, Defendant Kristianson continued to transport Plaintiff Jane Doe 1 and her sister to cheer practices and continued to accompany the family on trips and to events. In or around March of 2022, Plaintiff Mary Doe allowed Plaintiff Jane Doe 1 and her sister to travel with Defendant Kristianson to the home of another cheer coach in South Carolina.

285. Around the same time, Plaintiff Mary Doe observed special attention Defendant Kristianson was paying to her daughter, Plaintiff Jane Doe 1, complimenting her skill and offering additional tumbling classes.

286.    Plaintiff Mary Doe also noticed a rift between Plaintiff Jane Doe 1 and Plaintiff Mary Doe's other daughter, Plaintiff Jane Doe 1's sister.

287.    Around this time, Plaintiff Mary Doe noticed a change in her daughter's dress, mood, and overall demeanor. Despite the warm Florida climate, Plaintiff Jane Doe 1 would only wear baggy, oversized sweatpants and sweatshirts. Plaintiff Jane Doe 1, who was normally outgoing and upbeat, was suddenly aloof, reclusive, and behaving strangely.

288.    In late June or early July of 2022, Mary Doe asked Plaintiff Jane Doe 1 about what was troubling her. At this time, Plaintiff Jane Doe presented Mary Doe with video recordings of Defendant Kristianson engaged in sexually abusive behavior with Plaintiff Jane Doe 1 and others.

289.    Plaintiff Jane Doe 1 told Mary Doe that she created these recordings because she feared without solid proof, nobody would believe her if she disclosed the abuse.

290.    One of the videos showed Defendant Kristianson naked in a shower stall, masturbating with a small blue massage device while talking to Plaintiff Jane Doe 1 and other minor children. During this recording, Defendant Kristianson is

heard asking Plaintiff Jane Doe 1and the other minor children to retrieve items for him and bring them to him in the shower.

291.   The second recording was a FaceTime call from Defendant Kristianson to Plaintiff Jane Doe 1 and a friend. In the recording, Defendant Kristianson is lying nude with his penis exposed to the camera. At several points throughout the recording, Defendant Kristianson points the camera towards the wall to reveal a shadow image of his erect penis. Defendant Kristianson is seen masturbating at several points throughout the video. The video also clearly shows in the "caller box" at the top right side of the screen, the faces of Plaintiff Jane Doe 1 and her minor friend, who are on the receiving end of the call by Defendant Kristianson.

292.   Plaintiff Mary Doe confronted Defendant Kristianson with the video recordings, at which time Defendant Kristianson attempted to delete the recordings from Plaintiff Mary Doe's device before leaving Plaintiff Mary Doe's home.

293.   After Plaintiff Jane Doe 1 disclosed the existence of the videos, she also disclosed to Plaintiff Mary Doe that Defendant Erick Kristianson had exposed

his penis to her on numerous occasions, and touched her inappropriately while stunting, including on her buttocks and upper thigh areas.

294.   Plaintiff Jane Doe 1 would tell Defendant Kristianson to stop, but he would continue to touch her and grab her. Defendant Kristianson would ask Jane Doe if she had taken a shower or if she was wearing underwear.

295.   On one occasion in 2022, Defendant Kristianson instructed Plaintiff Jane Doe to retrieve a photo from his printer. When Plaintiff Jane Doe got to Defendant Kristianson's printer, she saw that the photograph Defendant Kristianson asked her to retrieve depicted his erect penis.

296.   Plaintiff Jane Doe 1 and another friend reported to Plaintiff Mary Doe that they saw Defendant Kristianson's penis on multiple occasions at the gym and at social events. Upon further questioning by Plaintiff Mary Doe, Plaintiff Jane Doe 1 and her friend stated that they "always see [Defendant] Erick [Kristianson]'s penis" and that Defendant Kristianson is known as "creepy Erick" around the gym.

297.   Only after learning of Defendant Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 1 and others did Plaintiff Mary Doe became aware that there were complaints made by other parents at Defendant Champion

Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

298.    Plaintiff Mary Doe further learned that at least one other parent at the gym instructed Defendant Hughes to keep Defendant Kristianson away from her child.

299.    Defendant Hughes addressed these complaints with Defendant Kristianson by instructing him to wear proper undergarments during practices, but did not take any further action to confirm compliance or deter the behavior.

300.    A former co-owner of Defendant Champion Elite left the gym in part over Defendant Hughes' inaction and mishandling of complaints about Defendant Kristianson's inappropriate sexual behavior with athletes.

301.    Reports of Defendant Kristianson exposing his penis to underaged athletes were made to Florida Department of Children and Families and Defendant USASF in October of 2021 and February of 2022, but no action was taken.

302.    In early July of 2022, within one day of Plaintiff Jane Doe 1's disclosure, Mary Doe reported the sexual abuse of her daughter, Plaintiff Jane Doe

1 and the sexually explicit videos of Defendant Kristianson to the Daytona Beach Police Department.

303.   On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

304.   Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

305.   As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

306.   During this timeframe, Plaintiff Jane Doe 1 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

307.   Plaintiff Jane Doe 1 and Mary Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms

and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

### *Jane Doe 2*

308.   Plaintiff Jane Doe 2 began cheering in or around 2019 when she was 10 years old.

309.   Plaintiff Jane Doe 2 began cheering at Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

310.   At all times relevant to this complaint, Plaintiff Jane Doe 2 was a member of USASF and paid her dues annually.

311.   Defendant Champion Elite Legacy was owned by Dr. Ashley Hughes, a chiropractor, and managed by Erick Kristianson, a 43-year-old man who also coached cheer at the gym.

312.   Mary Doe and Plaintiff Jane Doe 2 met Defendant Erick Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

313.   Over the next several months, Defendant Erick Kristianson introduced his mother to Mary Doe, Plaintiff Jane Doe 2 and their family and shared details about his religious upbringing out of state.

314.    Knowing that Mary Doe, her husband and children described themselves as a faith-based family, Defendant Erick Kristianson took great care to emphasize his lifelong connections to religious organizations and his religious upbringing. This commonality helped Defendant Kristianson form a swift and meaningful bond with Mary Doe, Plaintiff Jane Doe 2 and their family.

315.    Beginning in or around 2020, Mary Doe and her family began to see Defendant Erick Kristianson in social settings outside of the gym. Over time, Mary Doe and her family, including her minor daughter, Plaintiff Jane Doe 2, grew to love and trust Defendant Kristianson, welcoming him as part of their family.

316.    Mary Doe noticed that other parents at the gym trusted and cared for Defendant Erick Kristianson. Several of the families relied on Defendant Erick Kristianson to transport their children to and from cheer, and several of the families also included him in their social gatherings and events. Mary Doe and her family, including Plaintiff Jane Doe 2, grew to love and trust Defendant Erick Kristianson.

317.    Defendant Erick Kristianson would often transport Plaintiff Jane Doe 2 and her sister to and from cheer practices and other cheer competition events.

318.    Defendant Erick Kristianson accompanied Mary Doe, her husband, and children (including Plaintiff Jane Doe 2) on several weekend trips, including trips to Tampa, Universal Studios, and Busch Gardens. By all accounts, Defendant Erick Kristianson became like family to Mary Doe, her husband and children.

319.    In or around 2022, Defendant Erick Kristianson notified Mary Doe that he needed a place to stay. Mary Doe offered for Defendant Erick Kristianson to temporarily move in to a detached apartment on her property.

320.    During this time, Defendant Kristianson continued to transport Jane Doe 2 and her sister to cheer practices and continued to accompany the family on trips and to events. In or around March of 2022, Mary Doe allowed Plaintiff Jane Doe 2 and her sister to travel with Defendant Erick Kristianson to the home of another cheer coach in South Carolina.

321.    In or around early 2022, Defendant Erick Kristianson played a "game" with Plaintiff Jane Doe 2 that he called, "Jeepers Creepers," where he would discuss sexual content, grope and fondle Plaintiff Jane Doe 2. Defendant Erick Kristianson would initiate this "Jeepers Creepers" "game" in the car while Plaintiff Jane Doe 2 was riding in the front seat. (Defendant Erick Kristianson would insist that Plaintiff Jane Doe 2 ride with him in the front seat as opposed to the back seat

of the vehicle). During this "game" Defendant Erick Kristianson would run his hands up Plaintiff's leg and thighs and place his fingers and hands on her vagina. Plaintiff Jane Doe 2 was 13 years old at the time.

322.   Defendant Erick Kristianson kept a vibrator in the front seat of his vehicle that he would point out and discuss with Plaintiff Jane Doe 2 and other minor children. The existence and purpose of the vibrator was known to Plaintiff Jane Doe 2 and others.

323.   Defendant Erick Kristianson exposed his penis to Plaintiff Jane Doe 2 on numerous occasions both in and outside of the gym.

324.   Defendant Erick Kristianson once entered Mary Doe's home while he knew Plaintiff Jane Doe 2 was home alone and fondled Plaintiff Jane Doe 2's breasts.

325.   In or around late 2021 – early 2022, Defendant Erick Kristianson took Plaintiff Jane Doe 2, her sister, and other minors to a hot tub at a local resort. While in the hot tub, Defendant Erick Kristianson began to rub Plaintiff Jane Doe 2's leg. Plaintiff Jane Doe 2 told Defendant Erick Kristianson to stop, but he refused and instead escalated the assault, moving his hands to her vaginal area. Defendant Kristianson continued to grope Plaintiff Jane Doe 2's private area until she stood

up and told one of her friends that she was ready to leave. Defendant Kristianson overheard Jane Doe 2's comments and berated her, claiming that they had just arrived and leaving so soon would have rendered the entire trip a waste of time.

326.   In or around April of 2022, while at the EOC cheer competition in Orlando, Florida, Plaintiff Jane Doe 2, who has no history of seizures or a seizure disorder, experienced unexplained seizures and was transported three times by ambulance to a local hospital for evaluation and treatment. She was hospitalized for three days.

327.   In the summer of 2022, Mary Doe learned of Defendant Erick Kristianson's sexual abuse of her other daughter, including a video call wherein Defendant Erick Kristianson exposed his erect penis to two minors. Mary Doe reported this incident, along with the abuse of Plaintiff Jane Doe 2 to local law enforcement.

328.   After learning of Defendant Erick Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 2 and others, Mary Doe became aware that there were complaints made by other parents at Champion Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

329.    A former co-owner of Defendant Champion Elite Legacy left the gym in part over Ashley Hughes' inaction and mishandling of complaints about Defendant Kristianson's inappropriate sexual behavior with athletes.

330.    On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

331.    Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

332.    As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

333.    Another parent at the gym instructed Defendant Ashley Hughes to keep Defendant Erick Kristianson away from her child.

334.    Defendant Ashley Hughes addressed these complaints with Defendant Kristianson by instructing him to wear proper undergarments during

practices, but did not take any further action to confirm compliance or deter the behavior.

335.    Reports of Defendant Kristianson exposing his penis to underaged athletes were made to Florida Department of Children and Families and Defendant USASF in October of 2021 and February of 2022, but no action was taken.

336.    Plaintiff Jane Doe 2 has been diagnosed with Conversion Disorder and continues to experience seizures and other trauma-related symptoms as a result of Defendant Erick Kristianson's sexual abuse. She is prescribed medication and treats with a psychotherapist.

337.    Plaintiff Jane Doe 2 and Mary Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

338.    During this timeframe, Plaintiff Jane Doe 2 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

### *Jane Doe 3*

339.   Plaintiff Jane Doe 3 began cheering in or around 2017 when she was 8 years old.

340.   Plaintiff Jane Doe 3 began cheering at Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

341.   At all times relevant to this complaint, Plaintiff Jane Doe 3 was a member of USASF and paid her dues annually.

342.   Defendant Champion Elite Legacy was owned by Dr. Ashley Hughes, a chiropractor, and managed by Erick Kristianson, a 43-year-old man who also coached cheer at the gym.

343.   Joseph Doe and Plaintiff Jane Doe 3 met Defendant Erick Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

344.   Over the next several months, Defendant Erick Kristianson took a special interest in developing a friendship with Joseph Doe, taking great care to point out their common interests and hobbies.

345.   This commonality helped Defendant Kristianson form a bond with Joseph Doe and Plaintiff Jane Doe 3. Joseph Doe and Plaintiff Jane Doe 3 grew to love and trust Defendant Kristianson.

346.    In or around 2022, Defendant Erick Kristianson moved into an apartment on the property of one of Plaintiff Jane Doe 3's friends. Around this time, Defendant Kristianson spent a lot of time with Plaintiff Jane Doe 3 and her friends, both in and outside of the gym.

347.    Defendant Erick Kristianson accompanied Jane Doe 3 and others to Busch Gardens. During this trip, Defendant Erick Kristianson masturbated in Plaintiff Jane Doe 3's presence, and in the presence of other minor athletes.

348.    Defendant Erick Kristianson kept a vibrator in his vehicle. Defendant Kristianson would point it out to Plaintiff Jane Doe 3 and other minor athletes. Upon information and belief, the existence of the vibrator was common knowledge to Plaintiff Doe 3, her friends, and other minor athletes at Defendant Champion Elite.

349.    Plaintiff Jane Doe 3 and another friend reported to a parent that they saw Defendant Erick Kristianson's penis at a pool party. Upon further questioning by the parent, Plaintiff Jane Doe 3 and her friend stated that they "always see Erick [Kristianson]'s penis" and that Defendant Erick Kristianson is known as "creepy Erick" around the gym.

350.    Defendant Erick Kristianson would occasionally drive Plaintiff Jane Doe 3 and friends to events in his vehicle. Defendant Kristianson would insist that Plaintiff Jane Doe 3 ride in the front seat next to him. During these drives, Defendant Kristianson would grope and fondle her.

351.    Defendant Erick Kristianson would frequently inappropriately touch and hug Plaintiff Jane Doe 3 without her consent.

352.    On July 10, 2022, in the evening hours, Defendant Erick Kristianson reached out to Joseph Doe via text message and asked if he could come over to Joseph Doe's home to speak to him about something.

353.    Joseph Doe agreed to allow Defendant Kristianson to come over. When Defendant Kristianson arrived, he began to speak very quickly and in a panicked manner about a FaceTime exchange between Defendant Kristianson and Joseph Doe's daughter, Plaintiff Jane Doe 3, and another minor child. Defendant Kristianson told Joseph Doe that he was careless and accidentally exposed his genitals to Plaintiff Jane Doe 3. Defendant Kristianson told Joseph Doe that he had a recording of the call on his phone and proceeded to show Joseph Doe portions of the call, but retained total control of the playback function such that Joseph Doe

was unable to view the entire call and unable to ascertain any context of or conversation from the call itself.

354.   During this time, Defendant Kristianson was sweating profusely, behaving in a nervous manner and speaking rapidly to Joseph Doe. Defendant Kristianson told Joseph Doe that he was worried about his career and reputation being damaged as a result of the recording, which Defendant Kristianson characterized as being a misunderstanding or an accident.

355.   When Joseph Doe approached his daughter about the recording, Plaintiff Jane Doe 3 informed him that the recording was neither accidental nor a misunderstanding, but that she and friend created the recording of Defendant Kristianson to show the abuse and make a record of it because they feared that without such proof, they would not be believed.

356.   The recording was a FaceTime call from Erick Kristianson to Plaintiff Jane Doe 3 and a friend. In the recording, Defendant Erick Kristianson is seen lying nude with his penis exposed to the camera. At several points throughout the recording, Defendant Erick Kristianson pointed the camera towards the wall to reveal a shadow image of his erect penis. Defendant Erick Kristianson is seen masturbating at several points throughout the video. The video also clearly shows

in the "caller box" at the top right side of the screen, the faces of Plaintiff Jane Doe 3 and her minor friend, who are on the receiving end of the call by Defendant Erick Kristianson.

357.    After Plaintiff Jane Doe 3 disclosed the existence of the videos, she also reported that Defendant Erick Kristianson had exposed his penis to her on numerous occasions, and touched her inappropriately on several occasions, including on her breasts and legs.

358.    Plaintiff Jane Doe 3 would tell Defendant Erick Kristianson to stop, but he would continue to fondle her.

359.    After learning of Defendant Erick Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 3 and others, Joseph Doe became aware that there were numerous prior complaints made by other parents at Champion Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

360.    On July 11 2022, Joseph Doe reported the sexual abuse of his daughter, and the sexually explicit videos of Defendant Kristianson to the Daytona Beach Police Department.

361.   On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

362.   Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

363.   As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

364.   Plaintiff Jane Doe 3 and Joseph Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

365.   During this timeframe, Plaintiff Jane Doe 3 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

## JOINT AND SEVERAL LIABILITY

366.   Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiffs, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of Florida and the United States of America, including but not limited to the following:

   a.  Compensatory, actual, and consequential damages;

   b.  Statutory damages;

   c.  Punitive damages;

   d.  Reasonable attorneys' fees and costs;

   e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## THE COUNTS

## COUNT I
## VIOLATION OF THE PROTECTING YOUNG VICTIMS FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255 (ALL DEFENDANTS)

367.   Plaintiffs hereby reallege the factual recitations in the paragraphs 1-366 as if repeated verbatim herein.

368. This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendants Champion Elite, Hughes and Kristianson and enabled, aided and abetted, and assisted by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants through a variety of acts including certification, promotion, and credentialing, and continued access.

369. Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization.

370. Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

371. Defendants Champion Elite, Hughes, and Kristianson, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

372.   Defendant Champion Elite and Defendant Hughes were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being duly vetted members of a network marketed as safe and trustworthy for work with children, a certification for which Plaintiffs paid.

373.   In making these representations as a marketing tool and revenue source, but then failing to provide the service or abide by their own rules, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital aided and abetted the abusive conduct toward the minors by the covered individuals described above.

374.   Plaintiffs were minors at the time she was sexually abused and assaulted in contravention of 18 U.S.C § 2422, thus constituting violations of 18 U.S.C. §2255.

375.   Plaintiffs have suffered personal injuries as a result of these particular violations of law.

376.   Plaintiffs are entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

a. Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

b. Reasonable attorneys' fees and costs;

c. Punitive damages; and

d. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
## FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT TO 18 U.S.C. §1962(c) and §1962(d) (ALL DEFENDANTS)

377. Plaintiffs hereby reallege the factual recitations contained in paragraphs 1-366 as if repeated verbatim herein.

378. This count is brought against all Defendants.

379. United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

380.    Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

381.    Defendants' activities include at least two (2) acts of racketeering activity as described above and herein since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

382.    The racketeering activity is set forth in paragraphs 1-365_ and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)[32] and 18 U.S.C § and 2422, (sexual exploitation of minors).

383.    In or around 2002, the Varsity Defendants, Defendant USASF, Defendant Champion Elite and Defendant Hughes formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

384.    Defendant Charlesbank and Defendant Bain Capital agreed to join and facilitate this Enterprise with massive investments funding its ongoing

---

[32] As referred to herein, the following paragraphs set forth factual allegations that constitute mail fraud and/or wire fraud: 66, 68, 69, 78, 86, 93, 94, 99, 104, 106, 107, 108, 109, 110, 117, 118, 138, 140, 143, 145, 152, 153, 155, 162, 164, 170, 196, 199, 204-209, 211, 213, 218, 228(a)-(b).

operation in order to obtain significant financial benefits for their investors worth billions of dollars.

385.    This Enterprise, as previously described in this Complaint, and more specifically detailed in paragraphs 246-264, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes by exposing them to illegal sexual abuse and exploitation while continuously and repeatedly taking money from them in exchange for assurances of safety which were being fraudulently misrepresented by the Enterprise.

386.  Each Defendant, in concert with the Enterprise, engaged in misleading and fraudulent messaging to children and their families which they knew or should have known endangered children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

387.    In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

388.   In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

389.   The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the Defendants Champion Elite and Hughes acted in concert to commit the predicate acts of mail fraud and wire fraud as set forth in the preceding paragraphs.

390.   The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Champion Elite and Defendant Hughes, which allowed for Defendant Kristianson to commit sexual crimes against Plaintiffs without consequences.

391.   The Defendants knew or should have known that inappropriate contact was occurring between credentialed coaches and minor athletes based on seeing reports and evidence of inappropriate contact and/or misconduct, as well as the existence of one-on-one coaching being marketed and the travel of these children across state lines with coaches, as well as rumors of misconduct, some of

which has even been captured on camera, engaging in illegal and inappropriate acts with the minors.

392.   The Defendants owed a duty to the minor Plaintiffs, which they specially undertook based on known dangers, to disclose reports of inappropriate behavior and sexual relationships with children, to report crimes alleged against them, and to take steps to prevent alleged abusers from coming into contact with more minor children while under investigation.

393.   The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

394.   The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

395.   In addition to those messages set forth herein and above, the fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

    a.   Defendant Jeff Webb's personal creation of governing bodies which fraudulently held themselves out as independent authorities for rulemaking, safety assurance, and abuse investigation in order to

market Varsity business, charge minor children for membership to receive those services, and then recklessly failing to assert any control over them when they failed to perform the functions with which he vested them.

b. USASF 2009 Professional Responsibility Code and annual updates;

c. USASF Athlete Protection Messaging at the website and via email on November 16, 2017;

d. The 2020 Uniform Ineligible List, which Defendants falsely represented was a mechanism by which Defendants were properly patrolling and purging the sport of potentially dangerous adults;

e. Social media posts and images either promoted by or shared by Defendants, where Defendants supported the proliferation of Defendants Champion Elite and Jones, and individual coaches;

f. Marketing targeted toward minors and child athletes and specifically recruiting these athletes to travel over state lines to member gyms, and for camps, and competitions;

g. The creation of "Cheerlebrity," as a means to attract new minor athletes;

h.  Annual coach credentialing for Defendant Kristianson;

i.  Annual credentialing for Champion Elite's owner Ashley Hughes;

j.  Annual gym credentialing for Defendant Champion Elite;

k.  Fees accepted by USASF and/or the Varsity Defendants from Defendant Hughes;

l.  Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Kristianson;

m. Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Champion Elite;

n.  Annual billing and/or invoices to Plaintiff for her USASF membership renewal;

o.  Billing and/or continuing to receive payment from Plaintiff for uniforms, and other requisites of competition;

p.  Billing, invoicing, and/or fees for music, choreography, travel, and hotels;

q.  Explicit imagery sent to Plaintiffs while they were minors depicting nude adults;

r.  In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members." However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

s.  For years, USASF repeatedly misrepresented that it was partnering with the U.S. Center for SafeSport ("SafeSport") as part of its responsibility to athletes to prevent sexual abuse;

t.  Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every all-star athlete, so we've made resources available for use in gyms and studios."

u. Defendants' concerted efforts to prevent all-star cheer from being designated a "sport," which would have interrupted the Varsity Defendants' profits through independent regulation;

v. The Varsity Defendants' representations related to USASF and adoption of SafeSport;

w. USASF's representations related to the benefits of competing at "sanctioned events," which was a proxy for Varsity events;

x. Continued messaging by USASF that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

y. In July of 2019, USASF shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively

concealing these predators so that they could continue to feed the revenue stream.

z. USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy."

aa. USASF and USA Cheer codes of conduct and other policy statements, which operated across all Varsity-affiliated gyms, which touted that athlete safety was a priority, when, in fact, neither entity had uniform methods by which to ensure athlete safety;

bb. Materials associated with Varsity University, a gym and coaching conference;

cc. Such additional statements, messages, and/or materials as may be revealed during discovery in this matter.

396.   Each of the Plaintiffs had a property interest in their membership dues paid as set forth above and other fees and costs, and in the continued ability to cheer competitively.

397.    Defendants induced Plaintiffs, through promises of social media notoriety, "Cheerlebrity" status, scholarship opportunities, and, to one day become famous cheerleaders or coaches themselves one day and obtain the "legend status" their coaches boasted of, to become a gym owner, or to become an event promoter.

398.    The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiffs.

399.    But for the Enterprise's fraudulent assurances to Plaintiffs and their parents that the gyms, coaches, and events were certified safe, the abuse would not have occurred causing the injuries described above.

400.    But for the Enterprise's failure to investigate, report, or act upon reports of sexual abuse, Defendant Kristianson would not have been so emboldened to continue abusing minors, and taunting his victims that nothing would happen to him.

401.    Plaintiffs are entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

     a.  Compensatory, actual, and consequential damages, trebled in accordance with the statute;

b.  Reasonable attorneys' fees and costs;

c.  Punitive damages; and

d.  Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT III
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

402.  Plaintiffs hereby reallege the factual recitations in the paragraphs 1-366 as though repeated verbatim herein.

403.  Plaintiffs bring this claim for gross negligence against all Defendants.

404.  Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiffs, who were members of Defendants USASF and USA Cheer, participants in Defendant Varsity events, competing for Varsity-affiliated gyms, and under the care, custody, and control of each of the Defendants, respectively.

405.  As alleged above, Defendant Webb, on behalf of the Varsity Defendants, specially undertook this duty when he created Defendants USASF and USA Cheer with the primary purpose of retaining control over the industry he created so that competitors could not make rules that would affect his revenues.

406.    Moreover, and as alleged herein, the PE Defendants expressly represented that they undertook affirmative steps to enhance the safety features of the Varsity network, by, for example, institution of the Unified Ineligibility List, and further emphasis on credentialing and coaching certification.

407.    Defendant USASF, the Varsity Defendants, the PE Defendants, and Defendant Champion Elite have represented that credentialing generally, and specifically related to coaches, provided superior safety for athletes like Plaintiffs.

408.    Defendants have been aware that there are dangers associated with the operation of their Varsity network where adult coaches train minor athletes, including risks associated with inappropriate social contact, touching and other sexual contact, and emotional abuse.

409.    Defendants represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who interact with these athletes by virtue of the adults' position of power. These policies, procedures, rules, and/or guidelines included fraudulent representations related to SafeSport, and that Defendants USASF and USA Cheer were uniquely situated to help govern and regulate All-star cheer.

410.    Defendants have represented that participating in the Varsity network governed by Defendant USASF and USA Cheer is the means to maximize athlete protection for minor athletes.

411.    Defendants owed special duties to protect Plaintiffs while they paid dues and competed on behalf of a credentialed member club and under a certified coach. Plaintiffs entrusted Defendants with their physical, mental, and emotional care and well-being, and Defendants held themselves out as being uniquely able to protect Plaintiffs from harm caused by physical or other abuse.

412.    Defendants knew or should have known that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation were occurring on a regular and continuous basis by and through certified coaches at private all-star gyms, including Defendant Champion Elite.

413.    Defendants violated their responsibilities and duties to Plaintiffs in one or more of the following particulars:

a. Allowing Defendant Kristianson access to Plaintiffs when Defendants knew or reasonably should have known that he posed a threat of harm to children;

b.  Permitting Defendant Kristianson to remain in a position of power and particular trust over Plaintiffs;

c.  Allowing Defendant Kristianson to isolate Plaintiffs despite the known dangers associated with one-on-one coaching and interactions;

d.  Failing to enforce social media and other communications policies and procedures related to inappropriate conduct between Plaintiffs and Defendant Kristianson;

e.  Failing to report known instances of abuse or misconduct;

f.  Failing to adhere to SafeSport policy or procedure while fraudulently misrepresenting that they did;

g.  Failing to investigate potential misconduct, including among and between Defendant Kristianson and Plaintiffs despite knowledge that such inappropriate contact had occurred;

h.  Failing to train, supervise, monitor, or implement policies and procedures related to Defendants' employees and/or authorized representatives and their interactions with Plaintiffs;

i.  Failing to provide safe premises;

j. Failing to protect Plaintiffs from the foreseeable harm inflicted on them  by third parties contemplated in their rules and certification process;

k. Continuing to hold Defendant Kristianson out as a credentialed, and thus trustworthy, adult in the Enterprise; and

l. Such other conduct as may be revealed.

414. Defendants have known that one-on-one coaching, and intimate coach contact is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise.

415. Defendants are also aware of the close personal relationships many of these coaches form with minor athletes who the coaches gain access to by virtue of their USASF and USA Cheer credentials.

416. Defendants are further aware that, despite the known dangers of one-on-one contact, coaches routinely engage in intimate and exclusive contact with minor athletes, as well as travel with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the Enterprise.

417.   When complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants disregard or ignore same, do not report to any agencies, do not permanently strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

418.   Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

419.   Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

420.   Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

421.   Plaintiffs are entitled to damages pursuant to the laws of Florida, including but not limiting to the following:

  a.   Compensatory, actual, and consequential damages;

b.  Punitive damages; and

c.  Any and all other and further relief as this Court may deem

appropriate including pre and post judgment interest.

## COUNT IV
## NEGLIGENT SUPERVISION
## (VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT USA CHEER, DEFENDANT CHAMPION ELITE, AND DEFENDANT HUGHES)

422.    Plaintiff hereby realleges the factual recitations contained in the

paragraphs 1-366 as though repeated verbatim herein.

423.    Defendant USASF, the Varsity Defendants, and Defendants

Champion Elite and Hughes continued to employ, credential, and place Defendant

Kristianson in a particular and unique position of trust by allowing him access to

Plaintiffs.

424.    Despite claiming to conduct background checks and having the

authority to revoke eligibility certification from coaches or gyms where complaints

or reports of misconduct have been made, Defendants continued to let Defendant

Kristianson operate and manage Defendant Champion Elite and to provide

coaching services in order to generate income for the Enterprise.

425.    Furthermore, when Defendants became aware of allegations against

Defendant Kristianson, either of sexual misconduct, or that he had engaged in

inappropriate behavior in the gym, Defendants failed to report these activities to law enforcement agencies, or to take any other corrective action, instead preserving the reputation of the Defendants so that trust in its safety continued to generate income for all members of the Enterprise.

426.   The Varsity Defendants' business model, designed and implemented personally by Defendant Webb, relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

427.   Moreover, Defendant Champion Elite's business model relies upon access to credentialed coaches, and coaches who are extremely popular in the sport, to attract and perpetuate new athletes.

428.   In outwardly creating the appearance of a brand built on trust and athlete safety, and as part of the business model to charge for those assurances, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

429.   Defendants breached this duty in a number of particulars including by credentialing Defendant Kristianson, and allowing him to remain in a gym

setting with regular access to minor athletes, when Defendants knew or should have known he posed a significant threat of harm, failing to act or otherwise disregarding reports of abuse, discounting or otherwise ignoring specific information about Defendant Kristianson and his inappropriate interaction with Plaintiffs as described above in the Complaint.

430.   Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein, directly and proximately caused injuries to Plaintiffs.

431.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained physical, mental, and financial damages.

432.   Plaintiffs are therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

**COUNT V**
**ASSAULT/BATTERY**
**(DEFENDANT CHAMPION ELITE, DEFENDANT HUGHES, AND DEFENDANT KRISTIANSON)**

433.   Plaintiffs hereby reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim herein.

434.   Defendant Hughes, as owner and operator of Defendant Champion Elite, allowed an adult coach to access the minor Plaintiffs to illegally commit

illegal dissemination of obscene materials to minors and the nonconsensual sexual touching of the Plaintiffs.

435.    Said touching by Defendant Kristianson constituted sexual assault and sexual battery on the Plaintiffs.

436.    As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiffs experienced bodily injury, physical pain and suffering, and mental anguish; and are thus entitled to awards of actual damages in an amount to be determined through a trial of this matter.

**COUNT VI**
**BREACH OF CONTRACT**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT USASF, AND DEFENDANT CHAMPION ELITE)**

437.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim herein.

438.    At all times relevant to this complaint, Plaintiffs had duly executed contracts with Defendant Champion Elite, the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiffs, Defendants agreed to provide a competitive and gym environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

439.   During the course of these contractual agreements, Plaintiffs were subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF, and which Plaintiffs were required to attend by Defendant Champion Elite and the Varsity Defendants.

440.   During the term of these agreements, Defendant Champion Elite, the Varsity Defendants and Defendant USASF failed to provide Plaintiffs with the safe and secure environment they paid for, including by failing to enforce the policies, procedures, and standards expressly adopted by Defendant USASF related to credentialed coaches.

441.   These failures on the parts of Defendant Champion Elite, the Varsity Defendants and Defendant USASF constituted violations of the fundamental and material terms of the agreements between them and Plaintiffs.

442.   As such, Plaintiffs seek an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants and Plaintiffs, rescinding said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well

as for all such attorney's fees, costs, and pre-judgment interest to which Plaintiffs

may be entitled.

## COUNT VII
## UNJUST ENRICHMENT
## (AS TO DEFENDANT CHAMPION ELITE, THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, AND DEFENDANT CHARLESBANK)

443.    Plaintiffs reallege the factual recitations in the paragraphs 1-366 as

though repeated verbatim herein.

444.    As set forth herein, the cheer industry represents a multi-billion-

dollar enterprise where each young athlete annually spends thousands of dollars

toward gym memberships and private lessons, uniforms, accessories, competition

fees to the Varsity Defendants, and membership with USASF.

445.    At all times relevant to this complaint, Plaintiffs conferred non-

gratuitous benefits upon Defendants including annual competition and

membership fees, as well as continuous revenue toward uniforms, accessories,

private training, and other monetary benefits.

446.    Defendants realized the value of these benefits, including steady

annual revenue per athlete which precipitated massive capital investments from

the PE Defendants.

447.    To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

448.    Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs including through their annual USASF membership fees and Varsity competition fees and apparel and travel costs.

449.    Plaintiffs are therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

**<u>COUNT VIII</u>**
**FRAUD**
**(AS TO DEFENDANT CHAMPION ELITE, THE VARSITY DEFENDANTS, AND DEFENDANT USASF)**

450.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

451.    At all times relevant to this complaint, Plaintiffs were parties to numerous annual contracts whereby they agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility, and further agreed to pay substantial additional consideration and fees to

Defendants for a service Defendants did not provide while fraudulently misrepresenting that they did.

452.   As part of these agreements, and as alleged herein and above including in paragraphs contained at Footnote 33, Defendants represented to Plaintiffs that Defendants would be responsible for ensuring a safe environment and access to safe adults for Plaintiffs including an environment free from, and coaches who would not engage in, sexual, physical, and mental harm and exploitation.

453.   Defendants' promises were material to Plaintiffs' agreements, without which no agreements would have existed.

454.   Plaintiffs had a right to rely upon Defendants' representations, and did so rely.

455.   In addition, Defendants intended for Plaintiffs to rely on Defendant'' myriad representations and specific promises about the safety of the Varsity network through certification and credentialing.

456.   As set forth herein, even at the time they entered into the agreements with Plaintiffs, Defendants knew or had a reckless disregard for or willful blindness toward whether the environment they provided at competitions, in the

gym environment, and through certified coaches, was safe and free from harm and sexual, physical and mental abuse.

457.   In fact, Defendants knew that the environment they provided actually facilitated access by predators, including coaches, to underage athletes by predators, including coaches, choreographers, and other adults.

458.   Yet, with knowledge or a reckless disregard or willful blindness for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and collected fees from Plaintiffs.

459.   Defendants' misrepresentations included, without limitation:

a.   Certifying to Plaintiffs that Defendants were responsible for providing safe competitive and training environments;

b.   Certifying to Plaintiffs and their families that the adults involved in the gyms, and competitions, including coaches, had been duly vetted;

c.   Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior;

d.   Facilitating an unchaperoned environment for child-athletes;

e.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

f.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

g.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

h.  Such additional conduct as may be revealed during discovery and the trial of this case.

460.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

461.    Plaintiffs now seek an order from this court for damages in an amount to compensate them for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

**COUNT IX**
**NEGLIGENT SECURITY**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT CHAMPION ELITE, DEFENDANT BAIN CAPITAL & DEFENDANT CHARLESBANK)**

462.   Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

463.   The Varsity Defendants, the PE Defendants, and Defendant Champion Elite sponsored, created, hosted, and oversaw private All-star gyms, camps, coaches, and competitions where young adult athletes would converge at pre-determined locations, all established and governed by Defendants, and under the supervision of Defendants.

464.   When athletes competed at the private All-star gyms, camps and competitions hosted by Defendant Champion Elite, the Varsity Defendants, and the PE Defendants, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

465.   The Varsity Defendants, Defendant Champion Elite, and the PE Defendants received substantial revenue from these events.

466.   As part of their promotion of these events, the Varsity Defendants, Defendant Champion Elite, and the PE Defendants undertook a responsibility to ensure that the locations and events were safe for attendees, minor athletes who were likely to encounter adult coaches, choreographers, videographers, and attendees.

467.   The Varsity Defendants, Defendant Champion Elite, and the PE Defendants violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

a.   Disparate enforcement of policies, procedures, and guidelines related to coaching suspension, with the result that coaches were still allowed to attend Varsity Competitions and represent Varsity-affiliated private all-star gyms;

b.   Failure to provide adequate monitoring;

c.   Failure to provide sufficient background checks, with the result that hundreds of potential predators were allowed to gain access to underage athletes;

d.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol at all-star Gyms, and while attending Varsity events;

e.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic

images while competing on behalf of Varsity-affiliated gyms, and

attending Varsity events;

f.  Failing to ensure that Varsity member coaches were not forcing

themselves upon minor athletes, including at Varsity member gyms

and Varsity events;

g.  Failing to ensure that underage athletes were not being forced into

non-consensual sexual encounters with adults affiliated with

Defendants;

h.  Such additional conduct as may be revealed during discovery.

468.   As a direct and proximate result of Defendants' conduct, Plaintiffs

have sustained and will continue to sustain significant mental, physical, and

emotional injuries and damages.

469.   Plaintiffs now seeks an order from this court for damages in an

amount to compensate Plaintiff for the physical, psychological and emotional

harm caused by Defendants' conduct, as well as punitive damages, and such

additional damages in law or equity as this court deems proper.

**COUNT X**
**CIVIL CONSPIRACY**
**(AS TO ALL DEFENDANTS)**

470.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

471.    Defendants were a collective group of individuals working in concert and individually toward a common plan.

472.    Defendants, acting as a collective group and individually, were engaged in the reckless, intentional, or willful endangerment of the minor Plaintiffs, by exposing them to sexual abuse and exploitation while assuring them and their families that Defendants were providing safe conditions and premises for the athletes to compete.

473.    Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, and acting in reckless indifference to the safety of the children in the name of growing profits.

474.    Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

475.   Defendant Webb personally, on behalf of the Varsity Defendants, created the safety regulatory bodies with the primary purpose of retaining control free from outside regulation or competitor interference but recklessly and willfully failed to ensure Defendants USASF and USA Cheer were performing the roles he marketed to Varsity participants and which USASF and USA Cheer charged for.

476.   In 2014, Defendant Charlesbank further funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

477.   In 2018, Defendant Bain Capital took over the primary role in continuing to fund the purpose this scheme, with Defendant Charlesbank retaining an interest as they continued their dangerous misrepresentations and accepted the resultant monetary benefits.

478.   Defendants acted in concert to perpetuate this scheme, and it would not have been possible for them to carry it out without unique elements of participation by each of them.

479.   Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm

suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

480.   The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other adults and minor athletes based on the one-on-one coaching being marketed and the travel of children across state lines with their coaches, some of whom stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

481.   The Defendants owed a duty to Plaintiffs to make reports or disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

482.   The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

483.   The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

484.   But for the fraudulent assurances to Plaintiffs that the gyms and coaches were certified safe, the abuse would not have occurred, and Plaintiffs

would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for minor athletes.

485.    As a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to damages including but not limited to the following:

a.  Compensatory, actual, and consequential damages, trebled in accordance with the statute;

b.  Punitive damages; and

c.  Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## **COUNT XI**
### **RESPONDEAT SUPERIOR/VICARIOUS LIABILITY**
### **(AS TO DEFENDANT CHAMPION ELITE)**

486.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

487.    Defendant Champion Elite employed and retained Defendant Hughes, as well as Defendant Kristianson as a coach, and authorized Defendant Kristianson's access to minor athletes including Plaintiffs.

488.    Defendants Hughes and Kristianson were acting in the course and scope of their employment and/or agency, in the furtherance of the business of

Defendant Champion Elite, and as authorized representatives of Defendant Champion Elite.

489.   As such, Defendant Champion Elite was as responsible for the actions, inactions, omissions and failures of Defendants Hughes and Kristianson as though they undertook the actions of the Defendant coaches themselves.

490.   Defendant Hughes failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines of Defendant Champion Elite, greatly increasing the likelihood of bodily injury and harm to Plaintiffs.

491.   Defendant Kristianson committed grotesque criminal acts against Plaintiffs including physical, mental, and emotional abuse, sexual exploitation, assault, and other battery.

492.   This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

493.   Plaintiffs therefore actual, consequential, and such additional damages, including punitive damages as this court deems just and proper against Defendant Champion Elite for the acts of Defendant Kristianson.

## COUNT XII
## RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
### (AS TO DEFENDANTS USASF, USA CHEER & THE VARSITY DEFENDANTS)

494.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

495.    At all times relevant to this complaint, Defendant USASF and Defendant USA Cheer, in conjunction with and under the control of the Varsity Defendants, granted memberships and credentials to adults seeking to work as certified coaches within Varsity network gyms.

496.    At all times relevant to this complaint, Defendant Champion Elite was a Varsity gym, and therefore any adult working within the gym was required to be an authorized representative and strictly certified by Defendants USASF and USA Cheer.

497.    As expressly set forth herein, membership within Defendant USA Cheer and Defendant USASF and credentials from these organizations signaled to child athletes cheering for gyms within the authorized Varsity network that the adult coach had been expressly vetted by Defendants USASF, USA Cheer, and the Varsity Defendants and that the coach was an authorized representative on behalf of Defendants USASF, USA Cheer, and the Varsity Defendants.

498.   At all times relevant to this Complaint, Defendants USASF, USA Cheer, and the Varsity Defendants certified and represented Defendants Hughes and Kristianson were expressly authorized to work with children within the Varsity network, and the promotion of the same through the Varsity Defendants' social media and marketing content, created an apparent and/or implied agency.

499.   Defendants Hughes and Kristianson were acting in the course and scope of their employment and/or agency, in the furtherance of the business of Defendants USASF, USA Cheer, and the Varsity Defendants, and as authorized representatives of Defendants USASF, USA Cheer, and the Varsity Defendants.

500.   As such, at all times relevant to this Complaint, the Varsity Defendants, and Defendants USASF and USA Cheer held out Defendants Kristianson and Hughes as authorized representatives, and intended for Plaintiffs to rely upon these representations.

501.   Plaintiffs did in fact so rely, coming to Defendants USASF, USA Cheer, and the Varsity Defendants network gym because of Defendants Hughes and Kristianson's association with the Varsity network.

502.   As such, Defendants USASF, USA Cheer, and the Varsity Defendants were responsible for the actions, inactions, omissions and failures of Defendants

Hughes and Kristianson as though they undertook the actions of the Defendant coaches themselves.

503.   Defendant Hughes failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines of Defendants USASF, USA Cheer, and the Varsity Defendants, greatly increasing the likelihood of bodily injury and harm to Plaintiffs.

504.   Defendant Kristianson committed grotesque criminal acts against Plaintiffs including physical, mental, and emotional abuse, sexual exploitation, assault, and other battery.

505.   This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

506.   Plaintiffs therefore actual, consequential, and such additional damages, including punitive damages as this court deems just and proper against Defendants USASF, USA Cheer, and the Varsity Defendants for the acts of Defendant Kristianson.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court award the following damages, jointly and severally against Defendants, as provided by the laws of the United States and Florida, including but not limited to the following:

     a.    Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

     b.    Alternatively, liquidated damages as to Count I;

     c.    Costs of this action and attorneys' fees to Plaintiffs;

     d.    Punitive damages where permitted; and,

     e.    Any and all other and further relief as this Court may deem appropriate.

## **TRIAL BY JURY**

WHEREFORE, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: April 28, 2023

                    **OSBORNE & FRANCIS**

                    *s/ J. Robert Bell III*
                    J. Robert Bell III (FL Bar 115918)
                    Gregorio Francis (FL Bar No: 008478)
                    Joseph A. Osborne (FL Bar No: 880043)

925 S Federal Highway, Suite 175
Boca Raton, FL 33432
Phone: (561) 293-2600
Email:      rbell@realtoughlawyers.com
              gfrancis@realtoughlawyers.com
              josborne@realotughlawyers.com

*Attorneys for Plaintiff*

**STROM LAW FIRM, LLC**

*s/ Bakari T. Sellers*
Bakari T. Sellers (SC Fed. ID No. 11099)*
Jessica L. Fickling (SC Fed. ID No. 11403)*
Alexandra Benevento (SC Fed. ID No. 10734)*

6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email:      bsellers@stromlaw.com
              jfickling@stromlaw.com
              abenevento@stromlaw.com

*Attorneys for Plaintiff*

* PHV Petitions Forthcoming